Argued January 6, affirmed April 29, 1964

# DUTTON *v.* DONALD M. DRAKE COMPANY ET AL

391 P. 2d 761

*Thomas H. Tongue,* Portland, argued the cause for appellant. With him on the brief were Hicks, Davis, Tongue & Dale, William M. Dale, Jr., and Charles J. Strader, Portland.

*Lamar Tooze,* Portland, argued the cause for respondent Donald M. Drake Company.

*Edwin J. Peterson,* Portland, argued the cause for respondent Marus Marble & Tile Co., Inc. With them on the brief were Tooze, Powers, Kerr, Tooze & Morrell and James Arthur Powers, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, SLOAN, O'CONNELL, GOODWIN and DENECKE, Justices.

ROSSMAN, J.

This is an appeal by the plaintiff Harry J. Dutton, and a cross appeal by the defendants-respondents Donald M. Drake Company and Marus Marble & Tile Co., Inc., from a judgment notwithstanding the verdict which the circuit court entered in favor of the two defendants upon their motions. The verdict was in

favor of the plaintiff in the sum of $48,000 damages. We shall have no occasion to consider the cross appeal. The judgment notwithstanding the verdict was entered in the defendants' favor under a ruling that the evidence did not establish liability upon the part of either defendant to the plaintiff.

The plaintiff instituted this action to recover damages for an injury which he suffered July 14, 1960, in the structure entitled Lloyd Center in Portland. At that time Lloyd Center was nearing completion.

The defendant Donald M. Drake Company was the general contractor for most of the project. The defendant Marus Marble & Tile Co., as a subcontractor, performed much of the terrazzo work that constituted part of the structure.

Lloyd Center covers many blocks. Its tenants are stores, offices, banks, restaurants, and similar enterprises. It also houses a large ice-skating rink.

A tenant that had taken a lease upon space in the Center was know as Mannings. It operates restaurants on the Pacific coast. A sizeable restaurant was under construction for it in the Center. The plaintiff, as the manager of construction for Mannings, designed its restaurants and supervised their construction. He came from his home in California to the Center July 13 to inspect the restaurant's construction and negotiate for the building of another eating place in the Center to be known as Rinkside Cafe. He received his injury by falling after he had taken some steps upon the floor of the ice-skating rink which was at that time receiving a coating of terrazzo. The terrazzo had received its first grind and was awaiting the second or finish grind.

The plaintiff contends that he was an invitee and that it was, therefore, the duty of the defendants to have the premises in a reasonably safe condition for

his reception. Lloyd Corporation, Inc., owner of the project, is not a defendant. Each defendant denies that the plaintiff was an invitee. Each particularly denies that he was an invitee upon the floor of the ice rink.

The complaint, in specifying the neglect which it charges to the defendants, states:

"Defendants carelessly and negligently allowed water and grinding compound to accumulate and remain on the surface of said ice skating rink then under construction, creating a slick and hazardous condition.

"Defendants failed and neglected to place warning signs in and around said ice skating rink or otherwise warn plaintiff of the slick and slippery condition of the ice skating rink then under construction.

"Defendants failed and neglected to barricade said ice skating rink so as to prevent plaintiff and other persons in and about said ice skating rink from walking thereon.

"Defendants carelessly and negligently barricaded the walkway around said ice skating rink, then under construction, so that plaintiff and others using said area were unable to proceed around said ice skating rink."

The answer of each defendant, in addition to denying all charges of negligence, alleged that the plaintiff was guilty of contributory negligence. Each answer made the following charges:

"That plaintiff, with full knowledge and appreciation of the conditions existing at the time and place of his said fall, voluntarily exposed himself to them by attempting to walk on said ice skating rink then under construction.

"In entering upon a restricted area and one which was not open to pedestrian travel and in doing so, walking upon a surface which plaintiff

knew or in the exercise of reasonable care should have known that the materials being used in the construction of said surface were slippery."

Those charges are denied in the reply.

The plaintiff presents only one assignment of error; it reads: "The court erred in sustaining defendants' motions for judgment notwithstanding the verdict. The grounds of both motions were * * *."

One of the entrances to Lloyd Center is at Multnomah Street. July 14, the plaintiff entered the Center by that entrance. Multnomah Street lies east and west. A Center corridor begins at Multnomah Street and runs north until it reaches the ice-skating ring where it terminates. There the north-south corridor enters a corridor that runs east and west.

Adjoining the north-south corridor upon the east is a structure occupied by the Lloyd Center branch of the Meier & Frank store. To the west of the corridor is the building which houses Mannings restaurant. Unlike the Meier & Frank store, Mannings restaurant sets back from Multnomah Street and is separated from that thoroughfare by a covered parking area for automobiles. We do not know the width of the parking area, but it is less than the width of the Meier & Frank store.

Before his injury on the morning of July 14 the plaintiff had strolled about Lloyd Center for about a half-hour and then entered Mannings restaurant where he conferred with Mr. Howard Kinney, a supervising architect for the project. The two discussed the work that remained to be done to bring the utilities to the restaurant. The plaintiff then asked Mr. Kinney to accompany him to the offices of Lloyd Corporation where he proposed to request installation of the utilities and authorization for Mannings to build the Rink-

side Cafe. The two men then started for the Lloyd Center office on the third floor of the structure. The plaintiff intended to walk east upon the east-west corridor about two hundred feet where he would reach a staircase that led to the second floor. But as he left the restaurant he observed a scaffold in the east-west corridor upon which two plasterers were working and which was as broad as the corridor and therefore rendered it impossible for him to enter that passageway. Kinney had not intended to take the route which the plaintiff chose. As a witness for the plaintiff, he testified: "I started to my left and Mr. Dutton went right on ahead." After the plaintiff saw that the scaffold prevented him from entering the corridor that ran east, he stepped over a curb that separated the corridor from the rink and entered upon the incomplete terrazzo coating of the rink. Kinney, by turning left, intended to reach a staircase to the west. The plaintiff testified that the part of the rink's surface upon which he stepped was dry. He then took about four steps directly ahead whereupon his feet slipped from under him and he fell to the floor of the rink. He conceded that the place where he fell was wet.

■ The plaintiff, as we have said, contends that he was an invitee of the defendants. He fell after he had entered the ice skating rink. Therefore, if he is deemed an invitee, the record must show that he had been invited, expressly or impliedly, to enter the ice rink. The plaintiff has the burden of proof upon that subject.

The Drake Company, under contract with the owner of the Center (Lloyd Corporation, Inc.), had built the outer shell of the restaurant. Under contract with Mannings it had built the interior of the restaurant.

■ The principle of law which governed the plain-

tiff's status when he entered Lloyd Center is expressed in the following words which we take from *Employers M. L. I. Co. of Wis. v. Di Cesare and M. C. C. Corporation,* 194 NYS2d 103, 9 A.D.2d 379:

> "Workmen coming onto the premises to perform construction or repair work are, in effect, invitees, no matter whose employees they may be, and the duty owed them is generally analogous to that owed any business invitee * * *."

Although the plaintiff was not a mechanic but was a restaurant designer and construction superviser, yet, for the purpose of this case he should be deemed a workman. He came upon the premises to inspect work that was under way and to arrange for additional construction. As an employee of Mannings he was an invitee at least when he was in the open corridors of the Center. The question occurs as to his status when he left the corridor and stepped into the ice rink which was not a part of the structure intended for the use of those who wished to go about as pedestrians.

The mere fact that a person is invited into a structure and thereby becomes an invitee does not mean that he is an invitee in every part of the building and that he is at liberty to enter wherever he wishes. For example, a person who enters a bank and makes a deposit of money at the window of a teller would discover that his status as an invitee had changed to that of a trespasser if he attempted to make his way into the teller's cage.

*Napier v. First Cong. Church,* 157 Or 110, 70 P2d 43, holds:

> " 'Where a person has entered upon the premises of another under invitation, express or implied, he is bound by that invitation, and becomes a bare licensee if he goes, for purposes of his own, to some

part of the premises other than that to which he was invited, uses the premises for purpose or in ways other than those for which they were intended or to which his invitation extends, or remains on the premises beyond a reasonable time after his invitation has expired.' 45 Corpus Juris, Subject: Negligence, p. 794, § 198."

In *Grahn v. Northwest Sport, Inc.*, 210 Or 249, 310 P2d 306, the plaintiff, after viewing from the grandstand of the defendant's race track some automobile racing practice, went with others, at the conclusion of the practice racing, to the race track itself. While she was there a racing car collided with her. The decision said:

"The controlling question in the case is whether the plaintiff was an invitee of the defendant at the time she was injured, or a mere licensee.

\*     \*     \*

"We are of the opinion that the court did not err in entering judgment of nonsuit. It is perhaps arguable that plaintiff, as a member of the public, was an invitee of the defendant while she was in the grandstand. We express no opinion on that question. But there is no evidence that the invitation, if there was one, extended to the area occupied by the race track. \*  \*  \*"

In short, the record must contain evidence showing that the plaintiff was invited to the floor of the ice rink.

The plaintiff fell upon the ice rink's floor and not in some other place. It will be recalled that after he and Mr. Kinney had conferred in Mannings restaurant they started for the offices of the Lloyd Corporation on the third floor. We now quote the plaintiff's description of the conditions that confronted him when

he left Mannings restaurant and walked in the direction of the ice rink:

"Q Now, at the time, and I am referring particularly to July 13 and 14, could you tell me in the area I am designating here between Mannings on the north and the rink on the south side and over here to Meier and Frank, can you tell us was the sidewalk or walkway completed in that area?

"A No.

"Q In what way was it lacking completion?

"A There had been a surfacing and water proofing, but there was still to be a finish material, finish topping on top of that and smoothed off.

"Q Likewise, in the same area did you observe the condition at that time of the overhead?

"A That was unfinished yet. It wasn't plastered.

"Q Those situations existed at the time you were there on July 14, 1960?

"A They were in the process of finishing on the 14th, yes."

We have mentioned the fact that when the plaintiff stepped out of Mannings and was about to head east he saw ahead of him the scaffold upon which the plasterers were working and which blocked him from taking the course he had planned.

When the plaintiff left Mannings and headed for the east-west corridor he saw that he was proposing to go into a part of the structure which was incomplete and where mechanics were performing necessary work. The scaffold upon which two of them were at work blocked him from entering the east-west corridor. If it were necessary for the plasterers to remove their scaffold from time to time so that visitors could enter the east-west corridor, the work schedule would suffer and possibly the quality of the work would be impaired.

The plaintiff seemingly recognized the unreasonableness of asking the plasterers to remove their scaffold so that he could enter the east–west corridor, and in lieu of making such an unreasonable request stepped into the ice rink. It was not a passageway for pedestrians. The plaintiff recognized those facts. He saw upon the surface of the rink water and some of the treacherous residue which is produced in grinding terrazzo into its finished condition.

At one time the ice rink was separated from the corridor by a barricade. On the morning of the plaintiff's injury the barricade was not in place. However, a four inch curb separated the corridor from the rink. Boards had been laid over the curb to facilitate the work of hod carriers who were hauling wheelbarrow loads of plaster over the curbstone to the plasterers that we mentioned. The plaintiff argues that the absence of the barricade was an invitation for him to enter the rink. We do not believe that a barricade is needed to make a guest, who is in the corridor of a hotel, realize that he should keep out of the adjacent rooms. A facility such as planks and the removal of a barricade so that mechanics can work more expeditiously cannot be construed by a non-mechanic as an invitation for him to enter.

The plaintiff testified that before he came to Portland on July 13 he knew that it was planned to give the floor of the ice rink a finish coating. He was familiar with terrazzo, knew how it was made and that the wet residue that is produced by the grinding process which gives terrazzo its finished status is hazardous for those who undertake to walk upon it.

Terrazzo is made from a mixture of cement, sand, water, and marble chips. The mixture, when liquid, is poured upon the floor and after it has dried somewhat,

a grinding machine which uses water and sharp sand gives the terrazzo an even surface. The grinding produces a worthless residue to which the witnesses referred as slop and mud. The slop, when wet, is extremely slick and hazardous to walk upon. After the first grinding has taken place, the terrazzo must be kept wet for seven days and then the finish or final grind occurs. For the final grind the same grinding machine is employed as for the first grind but fine sand and water are used. This grind likewise produces the treacherous residue known as slop. After the first grinding has taken place the slop or mud is brushed into shallow piles by a squeegee process. The plaintiff mentioned a pile of slop which he noticed near by upon the ice rink's floor when he stepped upon it.

We take the following from the plaintiff's testimony:

"Q  In connection with some of your work, you knew what terrazzo surfaces were?

"A  That is right, yes.

"Q  Were you at that time in any way generally familiar with the way terrazzo floors were laid?

"A  Yes.

\*　　　\*　　　\*

"A  Then, I stepped over this curb, I noticed there was water out there in that corner and it was clear, it looked clear. The surface of the terrazzo had been cleaned off, although it was still a little bit dirty, \* \* \*

\*　　　\*　　　\*

"Q  You are familiar, or I will ask you if you are familiar with the slop or residue that comes off of the terrazzo floors when the grinding machines are used on them?

"A  That is right, yes.

\*　　　\*　　　\*

"Q This ground up marble and cement that comes off of the grinding machines, can you tell the jury what that stuff looks like and what it is like?
"A It looks like a grayish mud.

"Q Is it slippery?
"A Yes.

"Q How slippery?
"A Very.

"Q Is it safe to walk on?
"A No.

* * *

"Q When you fell isn't it a fact when you picked yourself up, you were wet?
"A Yes.

* * *

"Q Isn't it a fact on your shoes was a substance that looks like this grinding debris that comes off of the finishing of terrazzo?
"A Yes."

We did not take notice of the condition of the floor of the ice rink for the purposes of determining whether the plaintiff was guilty of contributory negligence but because we believe that the floor's condition has a bearing upon the issue as to whether the plaintiff had been invited to enter upon the ice rink's floor. Neither the plaintiff nor Mannings had any interest in the ice rink. The fact that the plaintiff plainly saw that the rink's floor was dangerous for pedestrians like himself must have informed him that no one had invited him to enter upon the floor.

The plaintiff does not contend that by entering upon the ice rink he was availing himself of the only route that would bring him to the offices of the Lloyd Corporation. He contends that the following circumstances invited him to enter upon the ice rink: (1) the plasterers' scaffold prevented him from entering the

east-west corridor and (2) the barricade between the ice rink and the corridor was not in place.

The plaintiff testified that there were many ways available to anyone who wished to go from the ground floor to the upper levels. He gave brief desicriptions of five of them. One of them was somewhat to the west and north of Mannings restaurant. Another which became an escalator had been used briefly while under construction by those who wished to go from the first to the second floor. According to the plaintiff, neither of those routes was available July 14. We accept his word. Another possible route was the one which the plaintiff was preparing to take. Still another route led through Meier & Frank store, but since that concern was receiving merchandise July 14, guards prevented people like the plaintiff from resorting to that route. We will now take note of the plaintiff's mention of a fifth route. July 14, before the plaintiff met Mr. Kinney, he strolled about the Center and while so doing found himself on the third floor near the Center's offices. As a witness he could not recall the route which he pursued in going to and from the third floor upon that occasion. However, the fact that he made the trip shows that a convenient route was available and that he had experienced no difficulty with it. We take the following from the plaintiff's testimony:

"Q You went to the upper floor around 9:30?

"A Around 9:30 yes.

"Q You did proceed from the Mannings job to the upper story or the Mall where the project office was?

"A That is right.

"Q You don't recall how you got there?

"A I don't recall whether I took the steps in front or not. I have used those.

"Q   What stairs?

"A   On the front corner next to Multnomah.  I have taken those in times past.

"Q   How many times have you used those?

"A   A couple of times.

＊          ＊          ＊

"Q   It is a fact, isn't it, you could have gone to the project office by walking down the passageway between Mannings and Meier & Frank and up those stairs or north?

"A   Yes.

"Q   You could have gone this way (indicating)?

"A   Yes.

"Q   And it is a fact, is it not, you could come out to the street entrance and come up that way?

"A   There are many ways to go."

The corridor or passageway running north and south which we have mentioned begins at Multnomah Street and lies between Mannings restaurant on the west and Meier & Frank store on the east.  The staircase to which the plaintiff referred in the testimony just quoted is at the Multnomah Street beginning of that corridor.  The quoted testimony of the plaintiff states that he had used the Multnomah stairs a couple of times in the past and that he thought he may have used them July 14 when he made his trip to the third floor before meeting Mr. Kinney.  At any rate, whether he used those stairs July 14 or not, it is a fact that those steps existed and that no evidence indicates that they were unavailable when the plaintiff wished to go to the Center's offices.

Accordingly, when the plaintiff came upon the plasterers' scaffold that blocked his progress, necessity did not require him to step onto the terrazzo floor of the ice rink.  Instead of stepping over the curb onto the terrazzo he could have retreated a short distance

and gone up the flight of steps at the Multnomah Street entrance of Lloyd Center.

The circumstance that rendered the route which the plaintiff chose dangerous to his safety was not due to any negligence upon the part of either defendant but to the fact that the construction in that area was incomplete and that needed work was there in progress. We noticed that the floor of the corridor near Mannings was incomplete and that the ceiling of the corridor had not been plastered. We also observed that two plasterers were at work upon the scaffold that barred the plaintiff's way and that hod carriers were hauling plaster in wheelbarrows in that area. Very likely, when the plasterers had completed the work rendered accessible by their scaffold they would move the latter to an adjacent location; it was equipped with casters. We also saw that the plaintiff had taken note of the condition of the terrazzo that covered the ice rink. He noticed water upon parts of it and observed that some of the water contained the treacherous slop and residue that renders it dangerous for anyone to enter upon the terrazzo.

■ We take the following from *Forgione v. Frankini Const. Co.,* 308 Mass 29, 30 NE2d 819:

"* * * One who enters upon premises where construction is going on must expect to encounter the conditions and risks that naturally result from the manner in which the work is openly and visibly being performed. He cannot rely upon barriers and safeguards which he might reasonably expect to find in a completed building, but which it is impossible or impracticable to maintain at various stages of construction. The defendant was under no obligation to change the method of doing the work. It was under no obligation to warn the plaintiff of that which was self-evident. So far as appears there was no wrought path or designated

course such as might convey to the plaintiff some representation or assurance of safety. He chose his own course * * *."

The following is taken from *Allen v. Jim Ruby Constr. Co.*, 138 Cal App2d 428, 291 P2d 991:

"There are other well settled principles which are pertinent to the question of defendant's duty toward the public. One is that a possessor of land has no duty toward persons who come upon the land to change the method of his operations which are carried on so openly as to be obvious to all observers (Prosser, page 631, supra). Another is that one who enters an uncompleted building takes the risk of using the premises in the condition in which he finds them. Mitchell v. A. J. Bayer Co., 126 Cal.App.2d 501, 272 P2d 870; Kolburn v. P. J. Walker Co., 38 Cal.App.2d 545, 549, 101 P2d 747; Irvine v. J. F. Shea Co., Inc., 41 Cal.App.2d 458, 460, 107 P2d 80; Nagle v. City of Long Beach, 113 Cal.App.2d 669, 671, 248 P2d 799; Ambrose v. Allen, 113 Cal.App. 107, 113, 298 P 169. The reasons for this rule make it applicable not only to the interior of a building but also to the immediately surrounding area with respect to conditions of the surface caused by the presence of materials deposited thereon in the course of the work of construction and which are not hidden from view. * * *"

See to like effect *Doyle v. Doyle*, 328 Mass 174, 102 NE2d 435, and *Collins v. Goodrich*, 324 Mass 251, 85 NE2d 771.

■ It is clear that the plaintiff had no occasion to enter upon the floor of the ice rink unless necessity drove him there. He had no invitation to walk upon the floor of the ice rink unless necessity issued him one. When the plaintiff saw that the plasterers' scaffold blocked his access to the route which he had intended to take and that the plasterers were doing necessary con-

struction work, the plaintiff had no right to assume that he had an invitation to enter upon the ice rink. The plaintiff knew that a safe route was available to him in the form of the Multnomah Street staircase. We have noticed that he was aware of that route and thought that it was possible that he had pursued it to the third level the morning of his injury. If a diagram and a drawing which were used at the trial give an impression of distances, the plaintiff would not have been compelled to walk a substantially different distance if he had taken the Multnomah Street route rather than the one that was blocked to him. There existed no necessity for the plaintiff to resort to the ice rink.

We find no merit in the assignment of error. The judgment of the circuit court is affirmed.